# UNITED STATES DISTRICT COURT
## District of Kansas
(Wichita Docket)

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                CASE NO. 6:25-cr-10016-EFM-04

MARTEL COSTELLO,

      Defendant.

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
(Doc. 142)

APPEARS NOW the United States of America, by and through Katherine J. Andrusak and Lanny D. Welch, Assistant United States Attorneys, and submits the following in response to the defendant's motion to suppress.

## I.    **PROCEDURAL HISTORY**

On February 20, 2025, Martel Costello, the defendant, was named, along with five additional defendants, in a multi-count Indictment which charged him in Count 5 with Possession of Fentanyl Analogue with the Intent to Distribute

1

on July 11, 2024.[1]  A Superseding Indictment was returned on August 5, 2025, wherein he was again charged in a single count (now Count 10) with Possession of Fentanyl Analogue on July 11, 2024.[2]  The defendant filed a motion to suppress the seizure of evidence found by Wichita police officers when he was arrested on July 11, 2024.[3]

## II.    FACTS

The investigation which led to the arrest of the defendant on July 11, 2024, began weeks earlier. Beginning in March of 2024, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and the Wichita Police Department (WPD) were jointly investigating a group of individuals who were distributing fentanyl pills in Wichita, Kansas. This group was organized by Raashad Robinson, and included Eddie Robinson, James Wilkinson, Hassan Smith, Jevante Oliver and the defendant.

In March of 2024, the Kansas Bureau of Investigation (KBI) was buying fentanyl pills from Daron Smith.[4]  During two of the KBI's buys Smith is observed coming and going from a residence at 520 N. Matthewson, Wichita, Kansas. This location is associated with Raashad Robinson. Later in March

---

1 Doc. 1.
2 Doc. 96.
3 Doc. 142.
4 Daron Smith was indicted and convicted of distributing fentanyl to the KBI in 25-CR-10007-EFM.

2024, ATF learns that approximately 300,000 fentanyl pills are interdicted through the mail with the destination of 520 N. Matthewson.

In April 2024, WPD executes a search warrant for the residence of Albert Thomas where 500 fentanyl pills are located and claimed by Thomas. In a post-*Miranda* interview, Thomas indicates he bought the pills from Daron Smith and his brother David Smith who obtained their product from Jevante Oliver.

By May 2024, Raashad Robinson has moved to a residence located at 10707 W. Graber in Wichita. Through surveillance and other investigation methods, the agents learned Raashad Robinson was bringing quantities of fentanyl pills to his residence which he then provided to his co-defendants, and others. Specifically, on May 7, 2024, law enforcement observed a number of individuals arrive at 10707 W. Graber that day spending 5 minutes in the residence and leaving carrying something out with them. Law enforcement observed Jevante Oliver arrive and spend approximately 4 minutes in the residence. Martell Costello also arrived and left the residence. Hassan Smith spends approximately 5 minutes in the residence. When he leaves, Smith is stopped by law enforcement and is found to be in possession of fentanyl pills which contain approximately 771.44 grams of fentanyl.

ATF and WPD continue surveilling the Graber residence and notice activity indicative of drug trafficking. On June 5, 2024, Martel Costello goes into Graber and later leaves with a sack. The following day, June 6, 2024, law enforcement observes a BMW, later determined to have traveled from Arizona, back into the garage of the Graber residence. Eddie Robinson and James Wilkinson are both stopped by law enforcement after spending time at Graber. Eddie is found to be in possession of approximately 60,000 fentanyl pills while James is found in possession of approximately 20,000 fentanyl pills. Martel Costello is also seen arriving at Graber that same day with a backpack.

Martel Costello is also seen at Graber in July prior to his stop by law enforcement. On July 6, 2024, Martel is seen spending approximately 3-5 minutes in the residence. On July 9, 2024, Martel was observed leaving Graber with a small bag in his hands. On July 11, 2024, prior to the traffic stop at issue, law enforcement conducted surveillance on Jevante Oliver and observed Oliver stop at a residence, Martel Costello exit said residence, enter Oliver's vehicle, then Martel re-entered the residence. A short time later Martel is seen getting in his vehicle and leaving the residence. Shortly after that a traffic stop was conducted.

Wichita police officers Brock Kampling and Aric St. Vrain were aware of the investigation being conducted by ATF and the WPD into this group's efforts to distribute fentanyl pills in Wichita, Kansas. On that day Officer Kampling saw a gray Chevy Malibu with Florida plates driving in the area of the intersection of 9th and Estelle streets in Wichita. At approximately 3:11p.m. Officer Kampling observed the driver of the Chevy Malibu fail to use a turn signal at least 100 feet prior to making a turn onto 9th street. WPD Officer Aric St. Vrain was also in the area and was able to see Officer Kampling and the Chevy Malibu. When the vehicle turned north onto Hillside Street both officers saw the Malibu strike the curb, but it continued to drive. Officer St. Vrain then stopped the vehicle and during that process both he and Officer Kampling recognized Martel Costello as the driver of the Malibu. Both officers were aware the defendant had recently been arrested with a firearm in a vehicle during a traffic stop.

When they approached the Malibu both officers smelled the odor of marijuana coming from inside the car. Because the defendant had recently been arrested with a gun in a vehicle Officer Kampling performed a pat down for weapons of Costello's person. When he reached the defendant's left upper leg he immediately recognized the feel of an item he concluded was contraband,

specifically hard pills. When Officer Kampling pulled the left leg of the shorts out, a bag containing approximately 100 blue M30 fentanyl pills fell to the ground. Costello was placed under arrest, and the pills were submitted for analysis where they were confirmed to contain fentanyl analogue. While Officer Kampling was engaged with Costello, Officer St. Vrain searched the Malibu and located a small quantity of marijuana on the center console and in a cup holder.

### III.    ARGUMENT

#### a.    Traffic Stop

"A routine traffic stop is a seizure and is treated as an investigative detention under the Fourth Amendment." *United States v. Leon*, 80 F.4th 1160, 1164 (10th Cir. 2023). The constitutionality of a traffic stop is governed by the "reasonable suspicion" standard announced in *Terry v. Ohio*, 392 U.S. 1 (1968). "A traffic stop is justified at its inception if an officer has (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009); *see also United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable

articulable suspicion that a traffic or equipment violation has occurred or is occurring."). "Once [an officer] observe[s] [a driver] commit a traffic violation, he [has] reasonable suspicion to stop [the driver's] car." *United States v. Parker*, 72 F.3d 1444, 1449 (10th Cir. 1995). "It is irrelevant, for purposes of Fourth Amendment review, 'whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop.'" *Botero-Ospina*, 71 F.3d at 787. "It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle." *Id.* The "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (citing *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

In Kansas, drivers are required to signal their turn at least 100 feet prior to making the turn. K.S.A. 8-1548 provides:

> **8-1548. Turning movements and required signals.** (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided.
>
> (b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.

As will be discussed below, when Officer Kampling observed the driver of the Malibu fail to properly signal his turn, he had reasonable suspicion to stop the vehicle for the commission of a traffic violation. In addition to the traffic infraction, both officers watched as the Chevy Malibu struck the curb as it proceeded north onto Hillside Street. This afforded the officers an additional reason to stop the Malibu to investigate possible impairment of the driver. Consequently, stopping the Malibu to conduct further investigation was proper.

### b.  Reasonable Suspicion of Driver Impairment

Irrespective of any statutory violation, Defendant's inability to keep the Chevrolet Malibu on the road by striking the curb during his turn provided Officers St. Vrain and Kampling with reasonable suspicion to believe that Defendant was driving while impaired, i.e., that he was sleepy, tired, drunk, or otherwise impaired. The Tenth Circuit Court of Appeals has recognized reasonable suspicion of driver impairment as a distinct and sufficient basis to stop a vehicle, irrespective of any statutory violation, and has found reasonable suspicion to stop on this basis where a driver has drifted over the lane marker once or twice.  *See*, *e.g.*, *United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir. 1996) (straddling center line supported reasonable suspicion that the driver was sleepy or intoxicated); *United States v. Tang*, 332 Fed. Appx. 446, 452 (10th Cir. 2009) (unpublished) (finding single

instance of driving vehicle two feet over right fog line for seven to eight seconds for 200 to 300 yards on interstate highway that curved gradually to the left with mild to moderate wind provided basis for officer's reasonable belief that "the driver of the vehicle was likely drowsy or impaired" so officer "had reasonable suspicion to believe that the driver of the vehicle was impaired, and this reasonable suspicion supports his stopping the vehicle to investigate the driver's condition"); *United States v. Lloyd*, 13 F.3d 1450, 1453 (10th Cir. 1994) (concluding that "[e]rratic driving [a sudden lane change without signaling and briefly veering a few feet off the road] supports an investigative stop to determine if the driver is intoxicated or to determine the reason for the erratic driving"); *United States v. Langel*, 269 Fed. Appx. 787, 790-91 (10th Cir. 2008) (unpublished) (finding single instance of drifting over center line by three feet of divided highway for about two seconds created reasonable suspicion that driver "might be sleepy or impaired, and could present a risk of harm to himself and others" where drift was not due to weather or road conditions); *United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995) (finding officer had reasonable suspicion to believe driver was impaired, providing justification for stop, where officer observed vehicle "swerve from the outside lane, straddle the center line, and swerve back to the outside lane"). The

defendant's failure to properly signal his turn and then striking the curb while turning the Malibu provided the officers with ample reasons to stop him.

### c.  Search of the Chevrolet Malibu

"Probable cause to search a vehicle is established if, under the 'totality of the circumstances' there is a 'fair probability' that the car contains contraband or evidence." *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998) quoting *United States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993). "First we note that the odor of marijuana by itself is sufficient to establish probable cause." *United States v. Johnson*, 630 F.3d 970, 974 (10th Cir. 2010). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search" *United States v. Ross*, 456 U.S. 798, 825 (1982).

When Officers Kampling and St. Vrain smelled the odor of marijuana coming from inside the Chevrolet Malibu they then had probable cause to search the entire vehicle and any compartment or container found therein. *Downs*, 151 F.3d at 1303 (smell of burnt marijuana establishes probable cause to search passenger compartment of vehicle but not the trunk; smell of raw marijuana establishes probable cause to search passenger compartment and trunk); *Johnson*, 630 F.3d at 974-75 (noting "the odor of marijuana by itself is sufficient to

establish probable cause" and affirming district court's find that trooper's credible testimony that there was a strong odor of burnt marijuana emanating from the car when he approached to question the passengers provided probable cause to search vehicle). Their discovery of fentanyl pills on Costello's person was lawful.

### d. Pat-Down Search of Costello

During a traffic stop, an officer may sometimes perform certain warrantless searches. "Once a vehicle has been lawfully detained pursuant to a valid traffic stop, the officers may order the driver and passengers out of the car without violating the Fourth Amendment." *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018) (citing *Arizona v. Johnson*, 555 U.S. 323, 331, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)). An officer may then conduct a pat-down search of the driver or other occupants "upon reasonable suspicion that they may be armed and dangerous." *Johnson*, 555 U.S. at 331. "The purpose of the limited pat-down search is not to discover evidence of a crime, but to allow the officer to pursue his investigation without fear of violence." *United States v. Manjarrez*, 348 F.3d 881, 886–87 (10th Cir. 2003).

Both officers articulated in their reports they knew who Martel Costello was and that before stopping him they had identified him as the driver of the

Chevrolet Malibu. Most importantly, they were aware he had recently been involved in a WPD car stop where a firearm was found in the vehicle he was driving. The officers could reasonably believe Costello was armed so a pat-down search was authorized under these facts.

"If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." *Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993). "The Supreme Court concluded that a 'plain feel' exception to the warrant requirement would justify the seizure of contraband detected during a pat down because the officer knew the nature of the item." *United States v. Thomson,* 354 F.3d 1197, 1200 (10th Cir.2003) (footnote omitted), *cert. denied,* 541 U.S. 1081 (2004).

### e.  Collective Knowledge Doctrine

The Tenth Circuit has routinely ruled that one officer's knowledge can be imputed on another through the collective knowledge doctrine. "Under the collective knowledge doctrine, the officer who makes a stop or conducts a search need not have reasonable suspicion or probable cause." *United States v. Latorre*,

893 F.3d 744, 753 (10th Cir. 2018) (quoting *United States v. Pickel*, 863 F.3d 1240, 1249 (10th Cir. 2017)). "Instead, the reasonable suspicion or probable cause of one officer can be imputed to the acting officer." *Id.* "Under the horizontal collective knowledge doctrine, a number of individual officers have pieces of the probable cause or reasonable suspicion puzzle, but no single officer has sufficient information to satisfy the necessary standard." *United States v. Whitley*, 680 F.3d 1227, 1234 n3 (10th Cir. 2012) (citation omitted). The inquiry in such a circumstance is "whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge" to satisfy the relevant standard. *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008). "Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action." *Whitley*, 680 F.3d at 1234. "Of course, the officer who has probable cause may possess that information as a result of communication from other officers. Thus, the 'horizontal' and 'vertical' collective knowledge categories are by no means mutually exclusive." *Chavez*, 534 F.3d at 1345 n.12.

The facts will show that WPD Officers St. Vrain and Kampling had reasonable suspicion for both a traffic stop and pat-down search of the defendant. The facts will further establish that prior to July 11, 2024, other law enforcement officers had gathered evidence of the defendant's participation in the distribution of fentanyl pills with Raashad Robinson, Jevante Oliver and others charged in this case. Law enforcement observed the defendant multiple times at 10707 W. Graber prior to July 11. As noted earlier, that address was essentially the epicenter of illegal activity for this organization because it is where most of the members received supplies of fentanyl pills from Raashad Robinson. They also noted Costello's close association with Jevante Oliver, a co-defendant who was, at that time, selling fentanyl pills to an undercover ATF agent.

### f.  Good Faith

Whether to suppress evidence under the exclusionary rule is a separate question from whether the government has violated an individual's Fourth Amendment rights. *Hudson v. Michigan*, 547 U.S, 547 U.S. 586, 591-92 (2006). The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *United States v. Leon*, 468

U.S. 897, 906 (1984) (quotations omitted). In *Leon*, the Court announced a good-faith exception to the exclusionary rule for searches conducted pursuant to warrants. 468 U.S. at 922-24. Under this exception, "if a warrant is not supported by probable cause, the evidence seized pursuant to the warrant need not be suppressed if the executing officer acted with an objective good-faith belief that the warrant was properly issued by a neutral magistrate." *United States v. Augustine*, 742 F.3d 1258, 1262 (10th Cir. 2014).

After deciding *Leon*, the Court decided *Herring v. United States*, 555 U.S. 135 (2009), and *Davis v. United States*, 564 U.S. 229 (2011), where the Court declined to apply the exclusionary rule in cases where officers did not conduct their searches under the authority of a search warrant. According to the *Davis* Court, "[t]he basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." 564 U.S. at 239 (quoting *Herring*, 555 U.S. at 143; alteration in *Davis*).

Given this insight, the Court now holds that, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. The rule "serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances

15

recurring or systemic negligence." *Id*. "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way." *Davis*, 564 U.S. at 238 (internal quotation marks and internal citations omitted; emphasis added).

More specifically, the *Herring* Court set forth several guideposts for application of the exclusionary rule, all of which focus on the culpability of the officer who is performing the law enforcement action at issue and the deterrence that would be gained by applying the rule: (1) "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence,'" 555 U.S. at 141 (quoting *Leon*, 468 U.S. at 909) (alteration in *Herring*)); (2) "the benefits of deterrence must outweigh the costs," *id*. (citing *Leon*, 468 U.S. at 910); (3) "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct," *id*. at 143; (4) "[t]he pertinent analysis of deterrence and culpability is objective," but still takes into account an officer's "knowledge and experience," focusing on "the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal in light of all of the circumstances" *id*. at 145 (quotations omitted); (5) "when police mistakes are the result of

16

negligence . . . rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way," *id*. at 147-48 (quotations omitted); (6) "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment," *id*. at 143 (quotations omitted); and (7) "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system," *id*. at 144.

This latter point is key. Indeed, the *Davis* Court explained that exclusion is warranted only if the benefit of deterring Fourth Amendment violations in the future outweighs the social costs of exclusion.

> Real deterrent value is a necessary condition for exclusion, but it is not a sufficient one. The analysis must also account for the substantial social costs generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Davis*, 564 U.S. at 237 (internal quotation marks and internal citations omitted; emphasis added); *see also Herring*, 555 U.S. at 141 (noting efficacy of the exclusionary rule is focused on deterring future Fourth Amendment violations, and that "the benefits of deterrence must outweigh the costs," which include "letting guilty and possibly dangerous defendants go free"); *Hudson*, 547 U.S. at 594 ("the exclusionary rule has never been applied except where its deterrence benefits outweigh its substantial social costs" (internal quotation marks omitted)).

Relevant here, the Court in *Davis* held that when an officer acts in objective reasonable reliance on binding appellate precedent, no basis exists to apply the exclusionary rule. *See Davis*, 564 U.S. at 231 (holding that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule"). *Davis*'s rule and rationale applies here because binding Tenth Circuit precedent justified both the stop of the Malibu based on reasonable suspicion of driver impairment, and the pat-down search of Costello. Accordingly, because the officers' stop and search of the Malibu were conducted in objectively reasonable reliance on binding appellate precedent, the fruits of the stop and search are not subject to exclusion. *See Davis*, 564 U.S. at 241 (2011) ("An officer who conducts a search in reliance on binding appellate

precedent does no more than act as a reasonable officer would and should act under the circumstances." (citation and internal quotation marks omitted)); *see also id.* ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule.").

### g. Conclusion

The United States respectfully suggests the defendant's motion should be denied.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
United States Attorney

/s/ *Lanny D. Welch*
LANNY D. WELCH, #13267
Assistant United States Attorney
301 N. Main, 1200 Epic Center
Wichita, KS. 67202
(316) 269-6481
Lanny.Welch@usdoj.gov

/s/*Katherine J. Andrusak*
KATHERINE J. ANDRUSAK, #25961
Assistant United States Attorney
301 N. Main, Ste. 1200
Wichita, Kansas 67202
(316) 269-6481
Katie.Andrusak@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of April, 2026, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system which will provide an electronic copy of the same to all counsel who have appeared in this matter.

/s/ *Lanny D. Welch*
LANNY D. WELCH
Assistant United States Attorney